IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLAUDE J. STILTZ,

    Plaintiff,

      v.

METROPOLITAN LIFE
INSURANCE COMPANY,

    Defendant.

CIVIL ACTION FILE
NO. 1:05-CV-3052-TWT

OPINION AND ORDER

This is an ERISA action to recover long-term disability benefits. It is before

the Court on the Plaintiff's Motion for Summary Judgment [Doc. 11] and the

Defendant's Motion for Summary Judgment [Doc. 12]. For the reasons set forth

below, the Plaintiff's motion is DENIED, and the Defendant's motion is GRANTED.

I. BACKGROUND

Effective January 1, 2001, Defendant Metropolitan Life Insurance Company

("MetLife") issued a group policy for long-term disability benefits under the KPMG

LLP Employees Long Term Disability Benefits Plan (the "Plan"). As an employee of

KPMG LLP,[1] Plaintiff Claude J. Stiltz was eligible to and participated in the Plan. The Summary Plan Description ("SPD") of the Plan provides that an employee meets the definition of disability if:

> [F]or the first 36 month period following your Elimination Period,[2] you are unable to perform the material and substantial duties of your Own Occupation, are under the regular care of a Doctor, and are not working at any job for wage or profit, unless in an approved Rehabilitation Program;
>
> [A]fter the first 36 month period, you are unable to perform any job for which you are qualified or for which you may become reasonably qualified taking into account your training, education or experience.

(Def.'s Mot. for Summ. J., Ex. 2 ("SPD") at 6.) In order to receive benefits under the Plan, a claimant is required to provide proof of disability, evidence of continuing disability, proof that the claimant is under the care and treatment of a doctor, information about other income benefits, and any other material requested by the plan administrator related to the claimant's disability. (SPD at 3.) MetLife, the insurer of the Plan, serves as the plan administrator and has the "discretionary authority to

---

[1]After the group policy was issued, KPMG LLP split into KPMG, Inc. and KPMG Consulting, LLP. In January 2003, KPMG Consulting, LLP changed its name to BearingPoint, Inc.

[2]The Elimination Period begins the day the employee becomes disabled and lasts for 25 weeks. (SPD at 1, 5.)

interpret the terms of the plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."  (SPD, ERISA Information.)

During a business trip to India in October 2001, the Plaintiff was allegedly exposed to typhoid fever.  Following the exposure, the Plaintiff asserts that he experienced symptoms of chronic diarrhea, vomiting, abdominal pain, weight loss, a change in bowel habits, chest pain, shortness of breath, body joint pain, and dyspnea upon exertion.  As a result, the Plaintiff stopped working for BearingPoint on November 3, 2001.  At that time, he was a Senior Manager.  In December 2001, the Plaintiff applied for short-term disability benefits.  MetLife approved the claim, and short-term disability benefits were paid for the maximum allowable time under the Plan.  Once his short-term disability payments ended, the Plaintiff became eligible for long-term disability benefits.  MetLife approved his claim for long-term disability benefits, effective May 2, 2002.

Following his hospitalization in late 2001 for typhoid fever, the Plaintiff was diagnosed by Dr. Anthony Captain, his internist, with irritable bowel syndrome, dyspnea, and post infectious syndrome secondary to typhoid fever.  In March 2002, Dr. Captain noted that the Plaintiff suffered from severe fatigue and had very minimal activity capabilities.  The Plaintiff was also having some vision and sleep difficulties.  (Def.'s Mot. for Summ. J., Ex. 10 ("Claim File") at 00397.)  Later that year, in

October 2002, Dr. Captain again reported that the Plaintiff suffered from intermittent episodes of irritable bowel syndrome and post infectious syndrome secondary to typhoid fever but was nevertheless "doing well" and had no major complaints.[3]   (Id. at 00505.)  Around this time, MetLife, as part of its review of the Plaintiff's claims, requested additional documentation of the Plaintiff's continuing disability.   In response, Dr. Captain completed an Attending Physician Statement and Physical Capacity Evaluation.   On this report, Dr. Captain indicated diagnoses of post infectious syndrome and dyspnea and stated that the Plaintiff could tolerate only minimal activity for no more than one hour a day.  (Id. at 00521-00522.)  However, the Plaintiff reported on an Activities of Daily Living Questionnaire that he performed various housework, including lawn care, once or twice a week and coached soccer two times a week.  (Id. at 00409-00410.)

On March 4, 2003, the Plaintiff returned for a follow-up visit with Dr. Captain. The Plaintiff reported decreased energy, fatigue, and difficulty sleeping.  Dr. Captain noted that the Plaintiff could not sit or stand for more than 30 minutes to an hour. However, he noted that the "[g]eneralized overall decreased motor function [was] due

---

[3]Two other office visits occurring around this time, i.e., October 11, 2002, and January 10, 2003, were merely follow-up visits with no examination.  On each occasion, Dr. Captain noted that the Plaintiff was doing well, with no major complaints.  (Claim File at 00480, 00506.)

to subjective weakness." (Claim File at 00263.)  The Plaintiff also continued to have gastrointestinal problems associated with irritable bowel syndrome.  (Id.)  On June 8, 2003, Dr. Captain completed another Attending Physician Statement for MetLife, indicating that the Plaintiff could sit, stand, and walk for an hour and could work for only between one and two hours a day due to functional weakness.  (Id. at 00005-00008.)

In an October 6, 2003 letter to MetLife, Dr. Captain reiterated that the Plaintiff suffered from irritable bowel syndrome but characterized the condition as variant with no real pattern.  He also indicated that the Plaintiff had significant tender point joint tenderness throughout his body and would be unable to function in a full-time work environment because he is unable to concentrate.   Nevertheless, Dr. Captain recognized that the majority of the Plaintiff's complaints were subjective, except for the presence of diffuse trigger point tenderness.  (Claim File at 00599-00603.)  On October 9, 2003, the Plaintiff returned to Dr. Captain for an office visit.  Dr. Captain reported that the Plaintiff complained of joint tenderness and pain in his wrist, elbow, neck, lower back area, and knees.  (Id. at 00539.)   Although the neurological examination was normal, Dr. Captain reported that the Plaintiff had decreased motor strength and decreased range of motion due to joint stiffness.  By this time, in addition to the previous diagnoses of irritable bowel syndrome, post typhoid fever syndrome,

and chronic obstructive pulmonary disorder, among others, Dr. Captain had diagnosed

the Plaintiff with fibromyalgia.  (Id. at 00539.)  Fibromyalgia is a rheumatological

disorder "characterized by diffuse musculoskeletal pain, stiffness, paresthesia,

nonrestorative sleep and easy fatigability."  Dorsey v. Provident Life & Accident Ins.

Co., 167 F. Supp. 2d 846, 848 (E.D. Pa. 2001) (quoting Harrison's Principles of

Internal Medicine 1706-07 (Kurt J. Isselbacher, et al., eds., 13th ed. 1994)).  This

disorder manifests itself through symptoms including:

> [G]eneralized aching and stiffness of the trunk, hip and shoulder girdles.
> Other patients complain of generalized aching and muscle weakness.
> Patients perceive that their joints are swollen; however, joint
> examination is normal . . . . Patients complain of exhaustion and wake up
> tired.  They also awake frequently at night and have trouble falling back
> asleep.  Symptoms are made worse by stress or anxiety, cold, damp
> weather, and overexertion . . . . Disorders commonly associated with
> fibromyalgia include irritable bowel syndrome, irritable bladder,
> headaches (including migraine headaches), and dysmeorrhea.

Id.

On February 4, 2004, the Plaintiff underwent a Functional Capacity Evaluation

("FCE") at HealthSouth.  During the evaluation, the Plaintiff was able to perform

aerobic, lifting, and positional tolerance tests but eventually had to stop due to

increased pain.  The test concluded that the Plaintiff had the capacity for "light work."

In particular, the evaluation showed that the Plaintiff could lift up to 38 pounds and

had the functional capability to sit, stand, and walk between 2.5 and 5.5 hours a day.

(Claim File at 00202-00208.)  The FCE results, as well as the Plaintiff's entire claim file, were submitted to an independent physician, Dr. Tracey Schmidt, for review.  Dr. Schmidt, a physician board certified in internal medicine and rheumatology,[4] had reviewed the Plaintiff's file on four previous occasions.  Each time, Dr. Schmidt concluded that although there were subjective reports of pain and fatigue from the Plaintiff, the file lacked sufficient objective medical evidence of a physical functional capacity impairment such that the Plaintiff could not perform his occupation.  (Id. at 00218-00223.)  On her fifth review, Dr. Schmidt evaluated the results of the FCE in light of the job description provided by BearingPoint.  According to BearingPoint, the Plaintiff's job required sitting, standing, and walking for three hours and occasionally lifting and carrying up to 20 pounds.  Noting that the employer's description placed the Plaintiff's job in the light work category, Dr. Schmidt again concluded that the file lacked objective evidence to show that the Plaintiff was functionally unable to perform his job.  (Id. at 00217.)  On April 27, 2004, after reviewing the Plaintiff's entire claim file, including the FCE results and Dr. Schmidt's reports, MetLife discontinued the Plaintiff's long-term disability benefits.  (Id. at 00224-00226.)  In its denial letter, MetLife stated:

---

[4]"Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist."  Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

> [A]lthough you have been diagnosed with multiple disorders and are treating with multiple physicians, you do have the ability to work at a light level job as defined by the Dictionary of Occupational Titles. Because the requirements of your regular job are defined as light, you are not disabled from your own job.

(Id. at 00225.)

The Plaintiff appealed the denial and submitted additional documentation, including records from Delta Air Lines showing the extent of the Plaintiff's travel, sleep studies, and orthopaedic records.  The Plaintiff also submitted a fatigue questionnaire and physical capacities evaluation completed by Dr. Captain in October 2004.  In that evaluation, Dr. Captain reported that the Plaintiff could only sit, stand, and walk for one hour during an eight-hour workday and could occasionally lift and carry up to 10 pounds.  He concluded that the Plaintiff did not have the capacity to do either sedentary or light work.  (Claim File at 00369-00370.)  These conclusions contradicted the results of the FCE.  After receiving the additional documentation from the Plaintiff, MetLife requested that Dr. Dennis S. Gordon, a second independent consulting physician, review the file.  Dr. Gordon is board certified in physical, rehabilitative, and internal medicine.  Although he questioned whether a diagnosis of post infectious typhoid fever exists, Dr. Gordon did agree with the diagnoses of fibromyalgia, mild obstructive sleep apnea, and irritable bowel syndrome.  However, he found that the file contained no objective basis for the Plaintiff's subjective reports

of weakness.  Dr. Gordon opined that the Plaintiff over reported his symptoms and that, despite any corroborating medical evidence, Dr. Captain gave undue weight to the symptoms.  (Id. at 00273.)  In contrast, Dr. Gordon found that the FCE, which has an empiric basis, gave a better estimate of the Plaintiff's actual capabilities.  Thus, Dr. Gordon concluded that the Plaintiff had a light level work capacity from February 2004 onward.  (Id.)  On January 5, 2005, MetLife upheld the decision to terminate benefits.

> In completing our appeal review, we have determined that although Mr. Stiltz had conditions that required medical care and treatment, he did not meet the definition of disability beyond April 27, 2004.  Mr. Stiltz's occupation is categorized in the Dictionary of Occupational Titles as a light duty job.  The Functional Capacity Evaluation performed on February 4, 2004 was considered valid and concluded that Mr. Stiltz had the ability to perform light duty work.  The Functional Capacity Evaluation had an empiric basis and gave a better estimate of Mr. Stiltz's capabilities other than the subjective, over-reported symptoms reported.  It was indicated in the letter of appeal that Mr. Stiltz's job required him to travel weekly to Washington, DC and overseas.  The definition of disability indicates you must be unable to perform the material and substantial duties of your own occupation.  Although Mr. Stiltz's job requires travel, his occupation of manager (in his local area) does not require travel.  The medical documentation on file did not support a severity in Mr. Stiltz's condition that would have prevented him from performing his own occupation as Manager, therefore, we find our original decision was appropriate.

(Claim File at 00378.)

Although the administrative review process had been exhausted, MetLife agreed, at the behest of the Plaintiff, to conduct an additional review of his benefits

claim.  In conjunction with this review, the Plaintiff submitted several statements made by the therapist who conducted the FCE, case law, and a favorable Social Security benefits decision.  No additional objective examination findings or clinical data were submitted.  On September 14, 2005, MetLife upheld its previous decisions. The Plaintiff subsequently filed this suit against MetLife, asserting claims for wrongful termination of benefits.  Both parties move for summary judgment.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  DISCUSSION

### A.     ERISA Standard of Review

Under ERISA, a plan participant or beneficiary may bring a civil action in federal court to "recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). At the outset in an action such as this one, the Court must determine the standard by which to review the administrator's decision to deny the disability benefits claimed by Plaintiff. The Act itself does not provide a standard of review for decisions of a plan administrator or fiduciary. In the absence of statutory guidance, the Supreme Court has established a range of standards for judicial review of benefits determinations under ERISA. In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held:

> [A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. . . . Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion.

Id. at 115 (citations and punctuation omitted). Consistent with Firestone, the Eleventh Circuit Court of Appeals has adopted three standards for judicial review of an administrator's benefits determination: (1) *de novo* review where the plan administrator is not afforded discretion; (2) arbitrary and capricious standard when the

plan grants discretion to the plan administrator;[5] and (3) heightened arbitrary and capricious standard where there is a conflict of interest. Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134 (11th Cir. 2004); Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1449-50 (11th Cir. 1997). Here, it is undisputed that the Plan expressly grants MetLife discretionary authority to interpret the terms of the Plan and determine eligibility for benefits. It is further undisputed that as both the plan administrator and insurer, MetLife operates under a conflict of interest. Thus, the parties agree that the heightened arbitrary and capricious standard of review applies.

Under the heightened arbitrary and capricious standard, the burden shifts to the plan administrator, acting under a conflict of interest, to show that its decision to deny disability benefits was not tainted by self-interest. HCA Health Servs. of Ga., Inc., 240 F.3d at 994. However, a district court's review of the administrator's decision does not always reach the burden-shifting stage of the heightened arbitrary and capricious analysis. The Eleventh Circuit has adopted a multi-step approach for reviewing virtually all ERISA plan benefit denials. See Williams, 373 F.3d at 1138

---

[5]The arbitrary and capricious standard parallels an abuse of discretion standard. HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001). Specifically, "the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989).

(establishing a six-prong analytical framework).  Because the parties agree that a conflict of interest exists, that approach can be condensed into the following three-part inquiry.  See Wise v. Hartford Life & Accident Ins. Co., 360 F. Supp. 2d 1310, 1317-18 (N.D. Ga. 2005).  First, the Court must apply a *de novo* standard of review "to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision."  Id. at 1318 (quoting Williams, 373 F.3d at 1138).  Second, if the Court determines that the administrator's decision was wrong, it must examine the reasonableness of that decision under the arbitrary and capricious standard of review.  See Williams, 373 F.3d at 1138.  At this stage, "the function of the court is to determine whether there was a reasonable basis for the decision based upon the facts as known to the administrator at the time the decision was made."  Jett, 890 F.2d at 1139.  Finally, where the Court finds that the decision was wrong but reasonable, it must examine whether the administrator's decision was tainted by self interest.  See Potter v. Liberty Life Assurance Co. of Boston, 132 Fed. Appx. 253, 259 (11th Cir. 2005) (citing Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1566-67 (11th Cir. 1990)).  The plan administrator may satisfy the burden of purging the self-interest taint by showing that "its wrong but reasonable interpretation of the

plan benefits the class of participants and beneficiaries." HCA Health Servs. of Ga., Inc., 240 F.3d at 994-95 (internal citations omitted).

    B.    *De Novo* Review

Under ERISA, the claimant has the burden of proving entitlement to disability benefits. Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998). Therefore, pursuant to the terms of the Plan, the Plaintiff has the burden of demonstrating that he is "unable to perform the material and substantial duties of [his] own occupation." (See SPD at 6.) In order to determine if MetLife's decision to deny benefits to the Plaintiff was *de novo* wrong,[6] i.e., the court disagrees with the administrator's decision, the Court must stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously. See Hanna v. WCI Cmtys., Inc., 348 F. Supp. 2d 1322, 1329 (S.D. Fla. 2004). MetLife concluded, after a review of the medical records, two independent physician consultants' reviews, and a Functional Capacity Evaluation, that the Plaintiff was capable of performing his own occupation.

---

[6] "Wrong" has been defined by the Eleventh Circuit as "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." HCA Health Servs. of Ga., Inc., 240 F.3d at 994 n.23.

According to MetLife, the objective medical findings indicate that the Plaintiff has the ability to perform light work.  (Claim File at 00378.)

1.    "Own Occupation"

As an initial matter, the Plaintiff contends that MetLife did not utilize the proper description of his occupation.  The Plaintiff argues that MetLife improperly relied on the Department of Labor's Dictionary of Occupational Titles ("DOT") instead of considering his actual job duties as a Senior Manager with BearingPoint. The DOT, which groups various jobs into "occupations" based on their similarities, is routinely used to define "occupations in the United States economy."  Tsoulas v. Liberty Life Assurance Co. of Boston, 397 F. Supp. 2d 79, 96 n.17 (D. Me. 2005), aff'd, 454 F.3d 69 (1st Cir. 2006).  The DOT describes "consultant"[7] as follows:

> 1.  Consults with client to define need or problem, conducts studies and surveys to obtain data, and analyzes data to advise on or recommend solution, utilizing knowledge of theory, principles, or technology or specific discipline or field of specialization: Consults with client to ascertain and define need or problem area, and determine scope of investigation required to obtain solution.
>
> 2.  Conducts study or survey on need or problem to obtain data required for solution.
>
> 3.  Analyzes data to determine solution, such as installation of alternate methods and procedures, changes in processing methods and practices,

---

[7]The occupational title code corresponding with "consultant" is 189.167-010.

modification of machines or equipment, or redesign of products or services.

4. Advises client on alternate methods of solving need or problem, or recommends specific solution.

5. May negotiate contract for consulting service.

6. May specialize in providing consulting service to government in field of specialization.

7. May be designated according to field of specialization such as engineering or science discipline, economics, education, labor, or in specialized field of work as health services, social services, or investment services.

Dictionary of Occupational Titles (4th ed., Rev. 1991); available at

http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT01F.HTM. Additionally,

the job description of "project director" or "project manager,"[8] which reflects the

managerial aspects of the Plaintiff's occupation, provides:

1. Plans, directs, and coordinates activities of designated project to ensure that goals or objectives of project are accomplished within prescribed time frame and funding parameters: Reviews project proposal or plan to determine time frame, funding limitations, procedures for accomplishing project, staffing requirements, and allotment of available resources to various phases of project.

2. Establishes work plan and staffing for each phase of project, and arranges for recruitment or assignment of project personnel.

---

[8]The occupational code corresponding with "project director/project manager" is 189.117-030.

3.  Confers with project staff to outline workplan and to assign duties, responsibilities, and scope of authority.

4.  Directs and coordinates activities of project personnel to ensure project progresses on schedule and within prescribed budget.

5.  Reviews status reports prepared by project personnel and modifies schedules or plans as required.

6.  Prepares project reports for management, client, or others.

7.  Confers with project personnel to provide technical advice and to resolve problems.

8.  May coordinate project activities with activities of government regulatory or other governmental agencies.

Id.

According to the Plaintiff, the material and substantial duties of his occupation include: (1) conferring with clients in various areas, such as functionality, technical requirements, project schedules, and problem resolution; (2) conducting presentations; (3) supervising and evaluating personnel; (4) ensuring that the project schedule is met as to delivery, cost, and profit; (5) translating client needs into project schedule; (6) determining technical solutions; and (7) travel.  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 4-5.)   With the exception of the travel component, these duties substantially align with those set forth in the DOT descriptions.  Although not every specific duty performed by the Plaintiff is mentioned in the DOT descriptions, the DOT general job descriptions are applicable because they involve comparable duties.

Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 272 (4th Cir. 2002).

Nevertheless, the Plaintiff maintains that his job as a senior manager with a large

consulting firm involves more strenuous activity than that considered by MetLife.  In

particular, the Plaintiff contends that MetLife failed to consider that his job with

BearingPoint required weekly travel to Washington, D.C. and some international

travel.  The Plaintiff asserts that such travel required him to spend approximately 50

minutes driving to the airport in heavy traffic, carrying heavy luggage, and

withstanding long flights.  According to the Plaintiff, his inability to sit for long

periods of time, lift and carry his luggage, and walk long distances precludes him from

traveling as required by his job.

In support of his argument that MetLife was required to consider the actual

duties he performed for BearingPoint, especially the travel and associated physical

burdens, the Plaintiff relies on Shahpazian v. Reliance Standard Life Insurance Co.,

388 F. Supp. 2d 1368 (N.D. Ga. 2005).  In Shahpazian, the plaintiff sought long-term

disability benefits after his left leg was amputated below the knee.  In order to receive

benefits, the plaintiff was required to show the inability to "perform the material

duties of his/her regular occupation."  Id. at 1370.  The plaintiff argued that the

defendant erred in referring to his occupation as performed in a typical work setting

for any employer in the general economy and ignoring the requirements of his specific

job.   In particular, the plaintiff objected to the failure to take into account his significant travel and on-site inspection responsibilities.[9]  Id. at 1374.  In addressing the correct interpretation of "regular occupation," Judge Duffey rejected the defendant's broad interpretation of the term and use of the DOT job descriptions.  Id. at 1376-77.   In doing so, Judge Duffey noted that in the absence of a specific definition of "regular occupation," the plan administrator was required to consider the plaintiff's actual duties, including his travel requirements.  Id. at 1378-79; but see Tsoulas, 397 F. Supp. 2d at 96 ("When the term 'occupation' is undefined, courts properly defer to the DOT definition of the term because insurers issuing disability policies 'cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation.'") (quoting Ehrensaft v. Dimension Works Inc. Long Term Disability Plan, 120 F. Supp. 2d 1253, 1259 (D. Nev. 2000), remanded on other grounds, 33 Fed. Appx. 908, 910 (9th Cir. 2002)).

   Shahpazian is distinguishable from and inapplicable to this case.   There, the court relied on the fact that the plan documents did not define "regular occupation."

_____

[9]Approximately 30% to 40% of the plaintiff's time as an accountant/principal with an accounting consulting firm was spent traveling, both to relevant business and insurance companies as well as to construction sites for on-site inspections.   When traveling, the plaintiff was often required to climb stairs and carry a laptop computer and briefcase weighing 10 to 15 pounds.  Shahpazian, 388 F. Supp. 2d at 1370.

Here, however, the Plan expressly defines "own occupation." <u>See</u> <u>Becker v. Hartford</u>
<u>Life & Accident Ins. Co.</u>, No. 8:05-cv-551-T-26MAP, 2006 WL 1360928, *7 (M.D.
Fla. May 17, 2006) (<u>Shahpazian</u> inapplicable where plan expressly excluded specific
employer and specific location from definition of "own occupation").  As stated
above, to collect long-term disability benefits for the first 36 months following the
Elimination Period, the claimant must prove that he is "unable to perform the material
and substantial duties of [his] Own Occupation."  (SPD at 6.).  "Own Occupation"
does not refer to the Plaintiff's specific job.  Rather, the SPD clarifies that "Own
Occupation" means "the activity that you regularly perform and that serves as your
source of income.  It is *not limited to the specific position you held with Your*
*Employer*.  It may be a *similar activity that could be performed with your Employer*
*or any other employer*."  (<u>Id.</u>) (emphases added).  "When an ERISA document is
unambiguous, the plan language controls." <u>Richards v. Hartford Life & Accident Ins.</u>
<u>Co.</u>, 356 F. Supp. 2d 1278, 1287 (S.D. Fla. 2004), <u>aff'd</u>, 153 Fed. Appx. 694 (11th
Cir. 2005) (punctuation and citations omitted).  Therefore, because the Plan explicitly
excludes specific positions and specific employers from its definition of "own
occupation," MetLife was not *de novo* wrong in relying on the general duties of the
relevant occupation rather than considering any specific travel requirements particular
to the Plaintiff's present job with BearingPoint. <u>See</u> <u>Becker</u>, 2006 WL 1360928, at

*6-*8 (administrator properly used DOT's general description of restaurant manager, rather than considering specific duties of claimant at particular restaurant, where plan's definition of "occupation" excluded specific job for specific employer or at specific location); Hamall-Desai v. Fortis Benefits Ins. Co., 370 F. Supp. 2d 1283, 1307 (N.D. Ga. 2004) ("regular occupation" was not claimant's own job with specific employer or in particular work environment and, therefore, "the Plan's disability definition requires that Desai not be able to perform one of the material duties of her *regular* occupation.  It does not require that she be unable to perform one of the material duties of her occupation as altered by her employer."); Richards, 356 F. Supp. 2d at 1287 (not error for administrator to rely on description of job as it is generally recognized in workplace where plan defined "your occupation" as "your occupation as it is recognized in the general workplace" and "does not mean the specific job you are performing for a specific employer").

In addition to considering the DOT, MetLife relied on the job description statement completed by the Plaintiff's employer on April 1, 2004.  (See Claim File at 00225, 00279.)  MetLife was not wrong in applying the employer's definition along with that of the DOT to the Plaintiff's occupation as a Senior Manager.  See Nyman v. Liberty Mut. Assurance Co. of Boston, No. 4:04CV2651, 2005 WL 2175706, *12 (M.D. Pa. Sept. 7, 2005); Kiloh v. Hartford Life Ins. Co., No. 8:04CV1741T24TGW,

2005 WL 2105957, *9 n.3 (M.D. Fla. Aug. 31, 2005).  According to his employer, the

Plaintiff's job requires him to sit, stand, and walk for three hours a day as well as

occasionally lift and carry up to, but never more than, 20 pounds.  (<u>Id.</u> at 00214.)

MetLife determined that the employer description, in conjunction with the DOT,

places the Plaintiff's occupation in the category of work that requires "light exertional

capability."[10] (<u>Id.</u> at 00279.)  "Light work" is defined as follows:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds
> of force frequently, and/or a negligible amount of force constantly
> (Constantly: activity or condition exists 2/3 or more of the time) to move
> objects.  Physical demand requirements are in excess of those for
> Sedentary Work.  Even though the weight lifted may be only a negligible
> amount, a job should be rated Light Work: (1) when it requires walking

---

[10]The Court notes that "consultant" and "project manager" are both identified
by the DOT as sedentary positions.  <u>Dictionary of Occupational Titles</u> (4th ed., Rev.
1991);  <u>available at</u>  http://www.oalj.dol.gov/public/dot/references/dot01f.htm.
"Sedentary work" is defined as:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity
> or condition exists up to 1/3 of the time) and/or negligible amount of
> force frequently (Frequently: activity or condition exists from 1/3 to 2/3
> of the time) to lift, carry, push, pull, or otherwise move objects,
> including the human body.  Sedentary work involves sitting most of the
> time, but may involve walking or standing for brief periods of time.  Jobs
> are sedentary if walking and standing are required only occasionally and
> all other sedentary criteria are met.

<u>Id.</u> at http://www.oalj.dol.gov/public/dot/references/dotappc.htm; <u>see also</u> 40 C.F.R.
§ 404.1567(a).  It is therefore apparent that MetLife adjusted the physical exertion
classification of the Plaintiff's occupation based upon the specific description
provided by the employer.

or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

Dictionary of Occupational Titles (4th ed., Rev. 1991); available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM; see also 20 C.F.R. § 404.1567(b). As described by the DOT and the Plaintiff's employer, the Plaintiff's occupation falls within the stated parameters of "light work." Thus, MetLife's classification of his occupation as such is not *de novo* wrong.

2.   Benefits Determination

As discussed above, the Plaintiff has the burden of establishing that he cannot perform the material and substantial duties of his occupation, which is appropriately classified as light work. According to the Plaintiff, as a result of fibromyalgia and irritable bowel syndrome, among other conditions, he is unable to perform his occupational duties because he suffers from pain, fatigue, and an inability to concentrate, he cannot walk or sit for long periods of time, he cannot lift and carry a sufficient amount of weight, and he suffers from blurred vision. In support of these assertions, and to meet his burden of establishing a disability under the Plan, the Plaintiff relies primarily on the opinions of his treating physician, Dr. Anthony Captain. In June 2003, Dr. Captain reported that the Plaintiff could frequently lift,

carry, and push up to 20 pounds and occasionally lift more than 20 pounds, that he had vision problems occasionally, and that he could sit, stand, and walk one to two hours a day.  (Claim File at 00005-00008.)   In October 2004, Dr. Captain completed a similar report, stating that the Plaintiff had a one-hour tolerance for sitting, standing, and walking, needed to lie down about 4 hours a day, and had no capacity for sedentary or light work.  Unlike the previous report, Dr. Captain reported that the Plaintiff could occasionally lift and carry only up to 10 pounds.  (Id. at 00369-00370.) It is unclear how Dr. Captain reached these conclusions because he did not conduct any specific functional capacity testing.  (Id. at 00220.)  In fact, in his office records, Dr. Captain states that the Plaintiff's decreased motor functions are due to subjective, rather than objective, weakness.  (Id. at 00263.)  Moreover, a number of Dr. Captain's opinions are somewhat inconsistent with the Plaintiff's self-report of his activities and abilities.  For instance, although he essentially claims to be unable to do much of any physical activity, the Plaintiff coaches a soccer team for two to three hours a week; he is able to do a number of household chores, including laundry, vacuuming, household repairs, and lawn care; and he participates on a walking team.  (Id. at 00205; 00259-00260; 00408-00409.)

Given the subjective basis of the Plaintiff's reports and Dr. Captain's opinions, two independent physicians that reviewed the file concluded that the Plaintiff was not

disabled under the terms of the Plan.  Dr. Tracey Schmidt conducted numerous reviews of the Plaintiff's medical records and each time concluded that the file lacked objective evidence of a physical functional capacity impairment to his occupation. (Claim File at 00217-00223.)  For instance, with regard to the Plaintiff's reports of fatigue and pain, the only objective evidence was that indicating the presence diffuse trigger point tenderness.  (Id. at 00220-00221.)  In addition, although the Plaintiff complained of an inability to concentrate, there was no record of a mental status examination or any neurological or psychological testing in support.  (Id. at 00220.) Rather, the neurological examinations performed showed no focal, motor, or sensory deficits.  (Id. at 00218.)

As part of the appeals process, the Plaintiff's records were also reviewed by Dr. Dennis S. Gordon.  Dr. Gordon noted the absence of any abnormal test results except for the presence of diffuse trigger points.  (Claim File at 00274-00276.)  Dr. Gordon determined that the fibromyalgia, mild obstructive sleep apnea, and irritable bowel syndrome diagnoses had been established but did not find any objective basis for the Plaintiff's reported weakness or limited capabilities.  (Id. at 00273.)  Conversely, Dr. Gordon found that the empiric results of a Functional Capacity Evaluation conducted in February 2004, provided a better estimate of the Plaintiff's actual capabilities.

Accordingly, Dr. Gordon concluded that the Plaintiff has a light level work capacity. (Id.)

The reviewing physicians did not dispute that the diagnoses of fibromyalgia, mild obstructive sleep apnea, and irritable bowel syndrome were supported by the record or that the Plaintiff suffered from pain as a result. (See Claim File at 00273, 00378). However, disability under the terms of a disability plan is not established simply because there has been a medical diagnosis or because a claimant suffers pain, even severe pain. Jordan v. Northrup Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2004); Hamall-Desai, 370 F. Supp. 2d at 1307; see also Sarchet, 78 F.3d at 307 ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether [plaintiff] is one of the minority.") (internal citation omitted). Thus, because the medical records did not contain "any objective examination findings or clinical data to substantiate a significant functional impairment to support the severity of a medical condition that would preclude [the Plaintiff's] ability to perform the requirements of his own light occupation" (Claim File at 00278), MetLife concluded that the Plaintiff was no longer disabled as of April 28, 2004. Like the reviewing physicians who noted the absence of any objective evidence that the Plaintiff's illnesses rendered him unable to work, the Court finds that the subjective complaints and opinions regarding pain, fatigue,

and lack of concentration are insufficient to establish that the Plaintiff is unable to perform the duties of his occupation.

The Plaintiff argues that it is error to require objective evidence because the presence or severity of fibromyalgia, which appears to be his primary disabling condition, cannot be shown with laboratory tests. Thus, according to the Plaintiff, to require such objective evidence would essentially preclude any claimant suffering from fibromyalgia from receiving disability benefits. The Plaintiff is correct in asserting that a diagnosis of fibromyalgia cannot be proved objectively.[11] See Jordan, 370 F.2d at 877. Here, however, the highlighted lack of objective evidence was in regard to the physical limitations placed on the Plaintiff's ability to perform his job, not whether he in fact suffers from fibromyalgia. In Brucks v. Coca-Cola Co., 391 F. Supp. 2d 1193 (N.D. Ga. 2005), as part of its *de novo* review, the court discussed whether it is appropriate for a plan administrator to require objective evidence when

---

[11]The American College of Rheumatology deems the diagnosis [of fibromyalgia] appropriate for an otherwise unexplained condition in which a patient complains of pain on the left side of the body, the right side of the body, above the waist, below the waist, and in the axial skeleton, and in at least 11 of 18 specified points when the examining physician palpates them with his thumb. The symptoms of fibromyalgia consist of the patient's reports of pain and nothing else. Objective tests, such as myelograms, rather than proving the existence of fibromyalgia, are used to rule out alternative explanations for the pain, leaving fibromyalgia as the remaining label for the collection of symptoms.

Jordan, 370 F.3d at 877.

an illness, in that case chronic fatigue syndrome, is not readily diagnosed with

objective tests.  Emphasizing the distinction between a diagnosis and the resulting

physical limitations, the court determined that it is indeed appropriate to require

objective evidence of the latter.

> The requirement that a plaintiff submit objective evidence of the impact
> of a diagnosed disease, illness or other condition is logical and necessary
> . . . . The objective-evidence requirement promotes integrity in the
> application of the law.  It assures claimants are treated fairly and with
> parity by providing that coverage decisions are not based on varying
> subjective expressions by claimants of a disease, illness or condition
> with which they have been diagnosed.  That is, it requires claimants to
> establish that the diagnosed disease, illness or condition results in an
> actual disability, not just a perceived one.  The requirement of objective
> evidence also promotes integrity by assuring there is corroboration for
> the claimant's subjective complaints, thus deterring embellished
> allegations of the effect of the diagnosed malady as well as deterring
> fraud in the claims process.

Id. at 1205.  Similarly, the First Circuit has recognized that "[w]hile the diagnoses of

chronic fatigue syndrome and fibromyalgia may not lend themselves to objective

clinical findings, the physical limitations imposed by the symptoms of such illnesses

do lend themselves to objective analysis."  Boardman v. Prudential Ins. Co. of Am.,

337 F.3d 9, 16 n.5 (1st Cir. 2003).  Thus, the plan administrator in that case was

justified in requesting objective evidence to show that the claimant's illnesses

rendered her unable to work.  Id. at 16-17.

In <u>Pralutsky v. Metropolitan Life Insurance Co.</u>, 435 F.3d 833 (8th Cir. 2006), the Eighth Circuit addressed circumstances similar to those presented in this case.  In <u>Pralutsky</u>, the plaintiff sought long-term disability benefits from MetLife after being diagnosed with chronic fatigue syndrome and fibromyalgia.  The record supported a diagnosis of fibromyalgia.  The plaintiff self-reported a functional inability to work and her physician opined that she was disabled.  <u>Id.</u> at 840.  However, as in this case, the record did not contain any objective medical findings of significant impairment.  <u>Id.</u> at 839-40.  Similar to the court's determination in <u>Brucks</u>, the Eighth Circuit held: "In view of the plan administrator's obligation to protect the plan's trust property by ensuring that disability claims are substantiated, it was not unreasonable for the administrator to require clinical documentation of [objective evidence], and to conclude that [plaintiff] had failed to prove that she was disabled under the plan." <u>Id.</u> at 841.  In a subsequent case also dealing with a claimant suffering from fibromyalgia, the Eighth Circuit again held that the plan administrator did not err in denying benefits where the plaintiff offered only subjective, uncorroborated complaints of pain and the objective evidence did not indicate that the illness rendered her disabled.  <u>Johnson v. Metropolitan Life Ins. Co.</u>, 437 F.3d 809, 814 (8th Cir. 2006).  As reflected in <u>Brucks</u>, <u>Boardman</u>, <u>Pralutsky</u>, and <u>Johnson</u>, where the claimant's condition manifests through subjective symptoms such as pain and fatigue, objective evidence of the physical

effects is particularly necessary to corroborate the subjective reports. Thus, this Court finds that it was not *de novo* wrong to require objective evidence to show that the physical limitations resulting from his diagnosed medical problems prevented the Plaintiff from performing the duties of his occupation.[12]

The only significant objective evidence contained in the record is the Functional Capacity Evaluation conducted by HealthSouth in February 2004. A Functional Capacity Evaluation ("FCE") is used to "define[] an individual's functional abilities or limitations in the context of safe, productive work tasks" and consists of "[a] series of test activities . . . to measure whether an individual has the ability to meet the required job demands." Bressmer v. Federal Express Corp., 213 F.3d 625, *1 n.1 (2d Cir. 2000) (quoting Phyllis M. King, et al., A Critical Review of Functional Capacity Evaluations, 78 Physical Therapy 852, 853 (August 1998)). An FCE is often considered the "best means of assessing an individual's functional level."[13] Fick v.

_____

[12]This was not a situation where the Plaintiff was unaware of MetLife's desire for objective evidence to substantiate his reported disability. Rather, Dr. Schmidt's evaluations repeatedly stated that the Plaintiff's file lacked objective medical evidence showing a sufficient physical functional impairment. (Claim File at 000217-00222.) Additionally, in its initial denial, MetLife notified the Plaintiff that the file "lack[ed] objective evidence of a physical functional capacity impairment to a full time light occupation." (Id. at 00225.)

[13] Although the Plaintiff points to one district court that has been hesitant to rely on FCEs in fibromyalgia cases, see Brown v. Continental Cas. Co., 348 F. Supp. 2d 358, 367-68 (E.D. Pa. 2004); Dorsey v. Provident Life & Accident Ins. Co., 167

Metropolitan Life Ins. Co., 347 F. Supp. 2d 1271, 1280 (S.D. Fla. 2004) (citing Lake

v. Hartford Life & Accident Ins. Co., 320 F. Supp. 2d 1240, 1249 (M.D. Fla. 2004)).

The FCE administered to the Plaintiff included musculoskeletal screening,

endurance/aerobic capacity evaluation, dynamic lift testing, positional tolerance

testing, and other functional and strength testing.[14]  (Claim File at 00202-00208.)  The

results of the FCE showed that the Plaintiff "was able to lift in the Medium physical

demand category up to 38 pounds but would be more appropriately placed in the Light

Physical Demand Category for an eight hour day."  (Id.)  As discussed above, the

employer-provided description indicated that the Plaintiff's job requires him to lift

only up to 20 pounds.  (Id. at 00214.)  The FCE further showed that the Plaintiff "was

---

F. Supp. 2d 846, 856 (E.D. Pa. 2001), other courts have found the results of FCEs to
be persuasive evidence in determining whether fibromyalgia actually rendered a
claimant disabled.  See, e.g., Donnell v. Metropolitan Life Ins. Co., 165 Fed. Appx.
288, 295-96 (4th Cir. 2006) (relying on FCE to show that sufferer of fibromyalgia and
chronic fatigue syndrome was not disabled under plan's definition); Wise v. Hartford
Life & Accident Ins. Co., 403 F. Supp. 2d 1266, 1277-78 (N.D. Ga. 2005) (in
determining whether administrator's decision was wrong, FCE provided persuasive
evidence that fibromyalgia-sufferer was not disabled).

[14]The Plaintiff argues that the FCE should not be relied upon because it was not
a "return to work" FCE.  The Court finds this argument unpersuasive.  Rather than
conducting a specific evaluation directed only at a "return to work" or
"occupational/work capacity," HealthSouth administered a "comprehensive functional
evaluation" to assess the Plaintiff's current capabilities and long-term disability.
(Claim File at 00076, 000208.)  There is nothing to indicate that a comprehensive
evaluation would not assess functionality as applied to a work environment.

able to perform the following positional tolerance frequently: sitting, standing, walking, stair climbing, stooping, overhead reaching, forward reaching, repetitive reaching, repetitive squatting, crawling, kneeling, and ladder climbing."  (Id. at 00208.)  "Frequently" is defined by the FCE, with reference to the DOT, as 2.5 to 5.5 hours.  (Id. at 00206.)   This functional capability satisfies the requirements, as indicated by the employer description, that the Plaintiff be able to sit, stand, and walk for three hours a day.  (See id. at 00214.)  Based on his physiological responses to the tests, rather than his subjective complaints, the examiner  concluded that the Plaintiff was capable of performing a job in the light work physical demand category.[15]  (Id. at 00076, 000208.)

Although the objective physical findings of the FCE indicated that he is capable of performing light work, the Plaintiff argues that Robyn Lewis, the physical therapist that conducted the FCE, opined that the Plaintiff was unable to perform his job.  In response to questions posed by the Plaintiff's counsel following the submission of the FCE to MetLife, Ms. Lewis stated that "based on the subjective job description given by [the Plaintiff] that is more descriptive regarding the physical demands, Mr. Stiltz

---

[15]The Plaintiff also claims that the FCE is not reliable because it was conducted on one of his "good days."  However, the burden is on the Plaintiff to prove disability and he failed to submit any FCE administered on a "bad day."  As such, the Court will not speculate as to the possible results of such a test.

does not meet the requirements to return to work as shown by your analysis of his functions." (Claim File at 00076.) However, Ms. Lewis indicated that she reached this opinion only after considering the Plaintiff's description of his specific job. As discussed above, the Plaintiff's description of his actual duties is not the relevant description of his "own occupation" under the Plan. Instead, the descriptions submitted by the employer and set forth in the DOT control. When considering the Plaintiff's capabilities in light of those job descriptions, which classified the Plaintiff's occupation as light work, Ms. Lewis stated that the Plaintiff is capable of returning to work. (Id. at 00076, 00208.)

This Court holds that the Plaintiff has not met his burden of demonstrating a disability under the Plan's definition. Based on the record, it appears that Dr. Captain's opinions of the Plaintiff's capabilities and his disability status are based primarily on the Plaintiff's diagnoses and subjective complaints.[16] Absent any corroborating objective evidence, this is insufficient to establish that the Plaintiff's illnesses prevent him from performing the duties of his occupation. Conversely, the objective evidence garnered from the FCE establishes that the Plaintiff has the

---

[16]Although Dr. Captain opined that the Plaintiff was disabled, the Supreme Court has stated that claims administrators are not required to accord special weight to the opinions of treating physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003).

functional capability to perform light work, the category into which his occupation is properly placed. As a result of this empiric evidence as well as the absence of any abnormal test results, two independent reviewing physicians concluded that the Plaintiff is not disabled under the Plan.[17] The evidence thus demonstrates that the administrator's decision was not *de novo* wrong, and granting the Defendant's motion for summary judgment is warranted.

## IV.  CONCLUSION

For the reasons set forth above, the Plaintiff's Motion for Summary Judgment [Doc. 11] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. 12] is GRANTED.

---

[17]The Plaintiff also briefly argues that MetLife erred by not considering an administrative law judge's decision to award Social Security benefits. The Court disagrees. First, in its final denial letter, MetLife acknowledged the receipt of the ALJ's evaluation and the fact that Social Security benefits had been awarded. (Claim File at 00279.) More importantly, because the standards and definitions of what qualifies as total disability may differ, a Social Security Administration determination is not dispositive of the issue of disability under a particular disability plan. Elliott v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999); Paramore, 129 F.3d at 1452 n.5; Archible v. Metropolitan Life Ins. Co., 85 F. Supp. 2d 1203, 1219 n.9 (S.D. Ala. 2000). Nevertheless, the Court notes that several of the ALJ's findings contradict the Plaintiff's self-reported disability and indicate that the Plaintiff is capable of performing his occupation. For instance, contrary to the Plaintiff's claim of significant concentration problems, the ALJ concluded that the Plaintiff has only mild restrictions of activities of daily living and mild difficulties maintaining concentration. (Id. at 25.)

SO ORDERED, this 30 day of August, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge